**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**TEAMSTERS LOCAL UNION**
**NUMBER 96, affiliated with the**
**INTERNATIONAL BROTHERHOOD OF**
**TEAMSTERS,**
**2120 Bladensburg Rd., N.E., # 106**
**Washington, D.C. 20018**


                    Plaintiff,

**v.**                                    **Case No. 1:06-cv-928 (ESH)**

**WASHINGTON GAS LIGHT COMPANY,**
**6801 Industrial Rd.**
**Springfield, VA 22151**

                    Defendant.

_____

**MEMORANDUM OF LAW IN RESPONSE TO**
**COURT ORDER TO SHOW CAUSE**

**I.      BACKGROUND AND PROCEDURAL HISTORY**

        This matter is before the Court upon the Motion for an Order to Show Cause filed by

Teamsters Local Union No. 96 ("Plaintiff, ""Local No. 96" or "Union") against Washington Gas

Light Company ("Washington Gas" or "Company").  The Motion was filed by the Plaintiff on

July 20, 2006, just three weeks after this Court rendered a one page Order on June 29, 2006, that

denied the Company's Motion to Dismiss and granted the Plaintiff's Motion for Summary

Judgment and Application to Confirm and Enforce the Arbitration Award.[1]  On July 21, 2006,

this Court issued an Order directing the Company to show cause by July 28, 2006 as to why it

_____

[1] The June 29 Order does not state or direct any date specific by when compliance with the Arbitration Award
was to have occurred. The only time period mentioned in the Order was a 24 day period of time within which
briefing on the plaintiff's request for fees and costs was to be conducted.

should not be held in contempt for failing to comply with the June 29 Order. The Plaintiff was then allowed until August 7, 2006, to file a reply to the Company's submission.

On July 28, 2006, the Company filed a timely Notice of Appeal of this Court's June 29 Order in the United States Court of Appeals for the District of Columbia, and in this Court, filed a response to the Motion for an Order to Show Cause and a Motion for a Stay of Execution Pending Appeal. The Plaintiff subsequently filed its response to which the Company replied.

On August 15, 2006, this Court issued an Order, denying the Company's Motion for a Stay stating that:

> [T]he Court will entertain plaintiff's Motion for Contempt of Court unless the defendant successfully obtains a stay from the D.C. Circuit by August 31, 2006. In the absence of a stay, this matter is set for a contempt hearing on September 7, 2006, at 2:00 p.m. at which time defendant may present evidence if it so desires. However, the Court is also ordering the parties to attempt to resolve this matter forthwith so that a contempt hearing can be avoided.

(See August 15, 2006 Order at 2). After several good faith but unsuccessful efforts to discuss resolution with the Union, Washington Gas implemented the Arbitrator's decision on September 6, 2006. [2] On September 7, the day of the scheduled hearing, the Court conducted a

---

[2] Washington Gas informs the Court that pursuant to the Court's August 15th Order, directing the parties "to attempt to resolve this matter forthwith so that a contempt proceeding can be avoided", and prior to the August 30th Court of Appeals decision on the Company's Motion for a Stay and the Union's Motion for Summary Affirmance, the Company, through counsel, made an offer of resolution to counsel for the Union, followed by efforts to engage counsel in discussions and to put forth the Union's position on what, if any back pay it believed was owed to individual members. In response, the Union, through counsel, made a demand, not for any individual member, but for what it claims as damages to the Union. This demand has no basis in law or fact, and certainly was not given any serious consideration by the arbitrator. In fact, in denying the Union's claim for damages, the arbitrator noted that he could not find an applicable legal basis for such an award. Arbitration Decision at pp. 21-22. Notwithstanding the extraordinary demand, the Company continued to urge the Union to meet and discuss how this matter could be resolved. We provided counsel for the Union with information about how the work is managed and how, in compliance with the arbitration decision, the Company has ceased allowing supervisory personnel to perform the work at issue. The Union refused to engage in discussions about resolving the matter, demanded only what in its view was compliance with the arbitration decision and extraordinary "damages", and in the only face-to-face meeting between counsel, tore up the Company's offer.

Just after the Court of Appeals denied both the Motion for a Stay and the Motion for Summary Affirmance on August 30th, the Company again suggested that the parties discuss resolution in advance of the scheduled contempt hearing. The Union again refused to talk. In the meantime, the Company timely paid the

conference call and subsequently directed that the parties instead file memorandum of law, "explaining how the Company has complied with Arbitrator Arrigo's December 31, 2005 award, why an order of contempt is not appropriate here, and what jurisdictional defenses, if any, the Company may have." The Plaintiff was given until September 19 to respond. (*See* September 7 Order).

Washington Gas respectfully submits that based upon all the circumstances of this matter, the Company has implemented Arbitrator Arrigo's Award, Local No. 96 cannot meet its burden of proof with respect to a finding of contempt against Washington Gas, and this Court lacks jurisdiction to determine whether the actions taken by Washington Gas complied with Arbitrator Arrigo's Award. [3] Accordingly, the Order to Show Cause should be dismissed.

---

Union the costs and fees that had been awarded by this Court. Prior the scheduled contempt hearing, and after much analysis about how the arbitrator's decision could be implemented under the circumstances, the Company sent the Union its Implementation Plan, again inviting discussion about the Plan. The Union, through counsel, "rejected" the Plan and the Company commenced implementation of the Plan by sending out letters to employees and retirees who formerly occupied Inspector classification positions. The details of the Implementation Plan and its execution are provided in the Supplemental Affidavit of Stephen Savage attached as Exhibit 1 to this Memorandum.

Finally, during the September 7th conference call on this matter, the Court again directed the parties to try to resolve this matter. Notwithstanding its prior implementation of the arbitration decision, but in direct compliance with this Court's directive, the Company again invited the Union to meet for discussions on resolution and to offer any amendments it might have to the Implementation Plan executed by the Company. Once again, the Union rejected this overture. This history demonstrates that the Company did all that it could to engage Local No. 96 in a dialogue about how this matter could be resolved and was met either by an extraordinary demand, not grounded in fact or law, or an outright refusal to engage in meaningful discussions. Furthermore, the time and effort spent by Washington Gas in pursuing its legitimate legal options by seeking stays in this Court and the Circuit Court and also, in attempting to engage the Union in discussions about how the matter could be resolved - at this Court's discretion - should not be considered contemptuous.

[3] The Company notes for the record that, when referring to the decision or award of the arbitrator, such referrals should not be construed as an acquiescence in or acceptance by the Company of the validity of the decision. That legal issue is now before the D.C. Circuit Court of Appeals.

## II.    ARGUMENT

### A.    Washington Gas Has Complied With Arbitrator Arrigo's December 31, 2005 Award

This Court has ordered Washington Gas to explain how it has complied with the December 31, 2005 Arbitration Award of Arbitrator Salvatore Arrigo.  In his Award, Arbitrator Arrigo provided the following ruling:

1.    The Employer did not violate Article VI, section 13 of the CBA by its elimination of Inspector classifications.

2.    The Employer violated Article XV of the CBA by transferring the work of Inspectors to supervisory personnel on February 9, 2005, and at all times thereafter.

3.    The Employer shall reverse its decision eliminating Inspector classifications and offer to all employees removed from the Inspector classifications the opportunity to accept reinstatement to their previous Inspector positions without loss of seniority or any other employee benefit and be made whole.

4.    The Employer shall cease diverting traditional Inspector work to supervisory positions and return the traditional Inspector work to Inspectors.

5.    The Union's request for monetary damages is denied.

 (See Arbitration Decision in the Matter of Teamsters Local Union No. 96 and Washington Gas Light Co., Grievance No. 20-05-10, attached to Plaintiff's Application to Confirm and Enforce Arbitration Award ("Arbitrator's Award").   The Arbitrator ruled that Washington Gas did not violate the parties' collective bargaining agreement by eliminating the Inspector classifications, but violated the applicable contract by transferring the work of the Inspectors to supervisory personnel. In addition, Arbitrator Arrigo denied the Union's request for monetary damages. Accordingly, there are only two directives from the Arbitrator's Award that are currently at

issue: that Washington Gas reverse its decision eliminating Inspector classifications and offer reinstatement to displaced employees, and cease diverting traditional Inspector work to supervisory positions. As explained in detail below, Washington Gas has in fact complied with those directives.

1.  *Washington Gas Has Reversed Its Decision Eliminating The Inspector Classifications*

a)  Washington Gas Had To Engage In Complex Analysis In Order To Implement The Arbitrator's Decision

Washington Gas has reversed its decision eliminating the Inspector classifications and offered reinstatement to employees impacted by the reorganization. Shortly after this Court issued the June 29 Order directing Washington Gas to implement Arbitrator Arrigo's Award, Washington Gas management convened a series of meetings to discuss the impact of the Court's Order and the challenges the Company would face in implementing the Arbitrator's decision. (See Supplemental Affidavit of Stephen Savage, Manager of Labor Relations and Human Resources Compliance for Washington Gas, attached as Exhibit 1, at ¶3 ("Savage Supp. Affidavit").

As a preliminary matter, it is important to note the complexity of the Arbitrator's Award, and the practical burdens Washington Gas faced in complying with the decision. In evaluating its implementation strategy, Washington Gas management had to review and consider, among other issues: how Inspector job duties have been historically shared with other employee groups, and how those duties are now being, or are capable of being, performed; the applicable provisions of the existing collective bargaining agreement between Washington Gas and Local No. 96; the Company's internal audit controls; and its obligation to comply with Section 404 of the Sarbanes-Oxley Act of 2002, which mandates that corporations have appropriate controls

established to mitigate risks associated with financial transactions.[4]  (*See* Savage Supp. Affidavit at ¶4). In addition, Washington Gas  had to evaluate the actual harm and negative impact on the Company and, potentially, the employees themselves that would result from immediately reinstating approximately 26 employees to the job classification that had been eliminated. (*Id.*).

A chronology[5] of Washington Gas meetings regarding the implementation of Arbitrator Arrigo's Award is detailed below:

- Upon receipt of the June 29 Order, Washington Gas immediately began discussions regarding the impact of and the implementation of the Arbitrator's Award.  (*See* Savage Supp. Affidavit at ¶3 & 6).

- On July 11, 2006, Beverly J. Burke, *Washington Gas General Counsel*, William Zeigler, *Vice President of Human Resources and Organization Development*,  Mark Krusec, *Director of Human Resources*, Robert Clayton, *outside counsel*, Andrea Adams, *outside labor consultant*, and Stephen Savage participated in a meeting to discuss the implementation of Arbitrator Arrigo's Award.  (*See* Savage Supp. Affidavit at ¶6).

- The next week, on July 21, 2006, another meeting was convened to include directors from the Construction Department to continue discussions regarding the requirements of the June 29 Order and its impact on Washington Gas operations.  (*See* Savage Supp. Affidavit at ¶11 Supplemental Affidavit of Tracy Townsend, Director of Construction for Washington Gas, attached as Exhibit 2, at ¶9 ("Townsend   Supp. Affidavit")).   William Zeigler, Mark Krusec, Tracy Townsend, and Douglas Staebler, *Division Head - Construction* attended the meeting. (*Id.*).  During the discussions, the various stakeholders discussed requirements of the Arbitrator's Award with particular focus on its impact on the Company's operations, a review of the current status of the 28 former Inspectors and how tasks previously performed by Inspectors are now being done.  (*See* Savage Supp. Affidavit at ¶11).

- On or about August 16, 2006, Mr. Krusec scheduled another meeting for Tuesday, August 22 to continue discussions regarding the June 29 Order. (*Id.* at ¶13). On August 22, 2005, a meeting was held at the SOC to further develop a strategy to implement the June 29 Order.  (*See Id.*; Townsend

---

[4] 15 U.S.C. ¶7262.

[5] As explained in the attached Affidavit of Stephen Savage, there were other issues that impacted the Company's implementation of the June 29 Order, such as: 4th of July holiday-related absences, time-consuming negotiations with another union, as well as the death of the mother of the Company's Labor Relations Manager.  (*See* Savage Supp. Affidavit at ¶s 6, 7, 8, & 12).

Supp. Affidavit at ¶11). Thomas Bonner, *Vice President - Engineering and Construction*, Ralph Fisher, *Division Head, Operations*, William Zeigler, Mark Krusec, Tracy Townsend, Douglas Staebler, Andrea Adams, and Stephen Savage all attended the meeting. (*Id.*). During the meeting, implementation of the June 29 Order was discussed and explored, along with the possibility of resolution of this matter, in accordance with the direction of the District Court. (*See* Savage Supp. Affidavit at ¶13).

- On August 24, 2005, Tracy Townsend, Mark Krusec, Stephen Savage, Chuck Whitley, *New Business Construction Manager*, and Jack Morrow, *New Business Construction Manager*, met again as part of the Company's continued efforts towards implementation of the Arbitrator's Award. (*See* Savage Supp. Affidavit at ¶14; Townsend Supp. Affidavit at ¶12). During this meeting, they performed a line-by-line review of the former Inspector job descriptions, which led to the formatting of color-coded job descriptions. (*Id.*). Washington Gas understood that Arbitrator Arrigo directed it to stop "diverting" work of the former Inspectors to Washington Gas supervisors. (*See* Savage Supp. Affidavit at ¶14). In order to cease "diverting" work, Washington Gas needed to know what could be "stopped" by carefully examining how, and by whom, former Inspectors' work is currently being done. (*Id.*). They completed a draft of the color-coded job descriptions on or about August 28, 2006. (*See* Savage Supp. Affidavit at ¶14; Townsend Supp. Affidavit at ¶12). As a result of the Company's analysis of the relevant job descriptions, they determined that only a small piece of the former Inspectors' job duties and responsibilities was actually being performed by management employees. (*See* Savage Supp. Affidavit at ¶14). That one task was the "random check of patches (one year old) to see how the area is holding up." (*Id.*). They determined that such limited amount of Inspector work could support only one position in the Inspector classification. (*Id.*). This determination was consistent with Arbitrator Arrigo's award which provided in part, **"[T]he Employer could rely on its management rights authority to declare an excess in the classification and its authority under Article VI, section 13, Excess in Classification to eliminate the Inspector classifications…It would appear section 13 would clearly be applicable if one-half of the classification was declared excess. Indeed the reduction in the classification might include a majority of the classification. Would the Employer be privileged to reduce the classification to all but one employee, but be precluded from completely eliminating the classification. I do not believe the language of Article VI, section 13 poses any such restraint on management's decision to eliminate the Inspector classifications.**[6]

---

[6] *See* Labor Contract between Washington Gas and Local No. 96, attached as Exhibit B to Plaintiff's Application to Confirm and Enforce Arbitration Award.

- On September 5, 2006, Tracy Townsend, Stephen Savage and outside counsel met again to finalize and implement the Company's implementation plan for the Arbitrator's Award, and thus the June 29 Order.   (*See* Savage Supp. Affidavit at ¶15; Townsend Supp. Affidavit at ¶18).

Thus, implementation of Arbitrator Arrigo's Award required Washington Gas to assess the reorganization of its workforce (primarily the Construction Department), modify job classifications, redistribute certain responsibilities and develop an implementation strategy that would allow Washington Gas to make offers of reinstatement to the persons formerly occupying the Inspector classifications.  Thus, Washington Gas first had to undergo  a rigorous business and legal analysis to determine how to best implement Arbitrator Arrigo's Award.

        b)      **Washington Gas Issued Offers of Reinstatement To**
                          **<u>Former Inspectors</u>**

Once Washington Gas determined how to implement Arbitrator Arrigo's Award and fully developed an implementation course, it promptly sent Teamsters Local No. 96 a copy of the "Washington Gas Light Company Implementation Plan for Compliance with the Award in Grievance No. 2005-10" (Implementation Plan), along with an election form offering each former Inspector the opportunity to be reinstated to the former Inspector classification(s). (See Savage Supp. Affidavit at ¶16, Exhibits 1 and 2 to the Affidavit). Additionally, on September 6, 2006, Washington Gas prepared mailings to 26 of the former Inspectors, and sent the mailings to displaced employees on September 7, 2006.  (*Id.*).

The Implementation Plan / Election Form requests that former Inspectors respond to Washington Gas by September 22, 2006 if they are interested in reinstatement.  As provided in the Implementation Plan, "WG will select the one candidate for the available *Inspector-Contractor Work* position based upon the seniority ranking of all of the former Inspectors who accept the offer of reinstatement to their former classification." (*Id.* at ¶17).  In the event that no

former Inspector accepts the offer of reinstatement, Washington Gas will post for one vacancy in the *Inspector-Contractor Work* classification and will fill such position, in accordance with applicable provisions of the labor contract, on or about September 22, 2006. (*Id.*).

Thus, Washington Gas has complied with the Arbitrator's mandate that it reverse its decision to eliminate the Inspector classifications by re-establishing the Inspector classification and issuing offers of reinstatement to employees previously removed from the Inspector classifications.

2. *Washington Gas Has Ceased Diverting Traditional Inspector Work To Supervisory Positions*

Arbitrator Arrigo ordered Washington Gas to, "cease diverting traditional Inspector work to supervisory positions and return the traditional Inspector work to Inspectors." As explained above, Washington Gas underwent a detailed analysis of the Inspector-Contractor Work and Inspector Pre-Installation classifications to determine what constituted "Inspector work." They determined that since the positions were eliminated, the work previously performed by the Inspectors classifications could be divided among: (1) those tasks that have been outsourced to contractors; (2) those tasks that were historically shared by multiple parties, including management, other union-eligible employees, and contractors, and continue to be performed by those parties, and (3) the tasks that were automated as part of the Appellant's implementation of Work Management Information System ("WMIS").[7]  A detailed analysis revealed that only a small piece of the former Inspectors' traditional job duties and responsibilities was now being performed by management employees. (*See* Savage Supp. Affidavit at ¶14).  That one task was the "random check of patches (one year old) to see how the area is holding up."  (*Id.*).  The

---

[7] See Townsend Affidavit at ¶14, and color-coded job descriptions attached as Exhibits 2 and 3 to Affidavit.

remainder of the Inspector work was being performed by contractors,[8] other union employees and/or by automation via the new WMIS--which was completely permissible under the parties' agreement. (*See* Townsend Supp. Affidavit at ¶14). The lone Inspector duty that was being performed by management employees was redistributed to the Inspector classification. (*See* Savage Supp. Affidavit at ¶14 & 17). Washington Gas then created an Inspector position to perform that function and as of September 22, 2006, supervisory employees will no longer be performing that function. (*Id.* at ¶17).

Therefore, Washington Gas has fully complied with the mandates of Arbitrator Arrigo's decision.

### B.    Washington Gas Should Not Be Held In Contempt

1.    *Plaintiff Cannot Meet it Burden to Establish a Prima Facie Case of Civil Contempt by Clear and Convincing Evidence*

The case law directs that in order to establish a *prima facie* case of civil contempt, the moving party must establish by clear and convincing evidence: 1) the existence of an order that is clear and reasonably specific; and 2) that the alleged contemnor failed to comply with the Court's order. *See, Broderick v. Donaldson*, 338 F. Supp. 2d, 30, 46 (D.D.C. 2004); *SEIU v. Children's Hospital Nat'l Med. Ctr.*, 604 F. Supp. 272 (D.D.C 1984) (denying contempt motion against employer who failed to reinstate employee pursuant to court order because although the

---

[8] The parties agreement allows Washington Gas to utilize outside contractors. Article XXII of the Agreement provides, "It is recognized that the Company has the right to have work done by outside contractors. However, work performed as of the effective date of this Agreement, by employees, covered by the Agreement, will not be contracted out if it will result in the layoff of full-time employees who normally perform such work. Further, the Company will not exercise its right under this Contract to discontinue any business unit while any contractor is engaged in work normally performed by employees in such business unit. The Company will continue to extend to the Union the courtesy of advance notification of "insourcing" or outsourcing opportunities." As explained in the supporting affidavits, contractors have historically performed many of the traditional duties and responsibilities of employees working in the Inspector classifications. (See Townsend Affidavit at 14-15). In fact, Washington Gas has contracted with seven (7) different subcontractors for a number of years to perform the Inspector responsibilities. (See Townsend Affidavit at 15). Thus, it is entirely permissible under the parties' contract for contractors to continue to perform traditional Inspector work.

employer had an obligation to do "something", the court order was not sufficiently clear, and thus the employer could not be held in contempt); *see also United States of America v. Local 1804-1*, 44 F.3d 1091, 1096 (2d Cir. 1995) (In a civil contempt proceeding….a contempt holding will fall unless the order violated… is "clear and unambiguous" the proof of non-compliance is "clear and convincing" and the contemnor was not reasonably diligent in attempting to comply. citations omitted). To be found in contempt (pursuant to Fed. Rules Civ. Proc. Rule 70), a party must have knowledge of a court order, the ability to comply with that order and must have **directly** violated the specific court order. *Joshi v. Professional Health Services, Inc*., 606 F. Supp. 302, aff'd  260 U.S. App. D.C. 154, 817 F.2d 877 (D.C. Cir. 1987).(*emphasis added*).  In this instance, Local No. 96 - the party seeking contempt - has the burden of establishing a *prima facie* case of contempt by clear and convincing evidence.[9]

       a)     The June 29 Order Is Not "Reasonably Clear" As To When Compliance With The Arbitrator's Award Was To Be <u>Accomplished</u>

Critical to the consideration of whether or not the Company should be found in contempt is the fact that this Court's June 29th Order does not specify a date by which compliance was demanded.[10]   The Order is absolutely silent on that issue. The only dates mentioned in that Order are a 24 day period within which  the Plaintiff was to file an affidavit for attorney's fees

---

[9] The period of time during which the issue of contempt arises commences no sooner than with the Court's June 29th Order.  There has been some suggestion that the Court should reach back to December 31, 2005, as a starting point, but the law does not support that suggestion. Nor is there any basis for a claim of "bad faith" because the Company declined to implement what it believed and still believes to be an invalid arbitration award. On this matter, the Company has been consistent in pursing its legal options. Most recently, the Court of Appeals for this Circuit determined that the legal issue of the validity of the award is not so clear as to warrant Summary Affirmance of this court's decision, and that the matter should proceed for briefing, with the parties specifically addressing this court's subject matter jurisdiction.  Thus, the Company's pursuit of legitimate and viable legal options cannot be said to have been evidence of "bad faith".

[10] The June 29 Order does not really direct the Company to undertake any specific action at all.  It simply states that the "Application to Confirm and Enforce the Arbitration Award is granted".

(within two weeks  or by July 13) and a direction that Washington Gas was to respond (within 10

days after that  or by July 24).  Significantly, under the applicable appellate rules, the Company

had 30 days from the date of the Order within which to note an appeal.

In *Joshi v. Professional Health Services, Inc.,* a case out of this district court that was

affirmed on appeal, the plaintiff claimed the defendants had violated a consent judgment and

should have been held in contempt for an alleged failure to "promptly" take certain acts in

furtherance of the consent judgment.  606 F. Supp. at 306. The defendant had not taken the

action **two months** after the Order affirming the consent judgment. Judge Harris found that

because there was no specific date detailed in the consent judgment by which the court-ordered

actions were to be taken - in that instance the execution of a contract - no language or directive to

take action "promptly" and no specific date by which the contract had to be executed, the

defendant's delay in signing, explained to the court, "cannot be contemptuous of the order". *Id.* at

305-06.

In affirming the district court's decision on this issue, the United States Court of Appeals

for this Circuit noted, in citing the U.S. Supreme Court, that "[t]he judicial contempt power is a

potent  weapon. [11] 817 F.2d   at 879 ( citing *International Longshoremen's Association v.

Philadelphia Marine Trade Association,* 389 U.S. 64, 79 (1967)). In light of the remedy's

extraordinary nature, courts rightly impose it with caution.

Similar to the plaintiff in *Joshi*, the Plaintiff in the case at bar cannot demonstrate by

clear and convincing evidence that Washington Gas knew or should have known that compliance

with the June 29 Order was demanded by the Court by a particular deadline, and certainly not

before the expiration of the statutory time within which the Company had to note an appeal of

---

[11] Judge Harris earlier recognized that when such contempt power is founded upon a decree to vague to be
understood, it can be a deadly one. *Joshi* at 306. (citation omitted).

the June 29 Order.  Thus, the Plaintiff cannot establish the first prong of a prima facie case of contempt.

b)    Washington Gas Has Neither Refused Nor Failed To
<u>Comply With This Court's June 29 Order</u>

Washington Gas' readily concedes that it had knowledge of the June 29 Order. In fact, the evidence shows that on July 11, a reasonable period of time after receipt of the Order (the written Order having been issued on Thursday, June 29th, with the intervening July 4th weekend when key personnel were on vacation), Company personnel met to begin to discuss options either to comply with the court order or to further pursue the Company's legal position on appeal.  (*See* Savage Supp. Affidavit at ¶6).  The Company's review of its options, including the conundrum that it faced with compliance, proceeded over the course of several meetings and discussions about how, under the circumstances, the award could be implemented.   (*See* Savage Supp. Affidavit at ¶4).

Before the Company could conclude on an appropriate course of action, and just three weeks after the June 29 Order, the Company's attention was directed to responding to the Union's premature Motion for an Order to Show Cause.  Subsequent to that, the Company was directed by the Court to discuss resolution with the Union, to which the Company devoted great effort, notwithstanding the Union's utter refusal to engage in meaningful discussions. (*See note 2, supra.*)

Simply stated, by the time the Union moved for an order to show cause, not enough time had passed for the Company to conclude on its next course of action, under all of the circumstances. This legitimate period of contemplation about involved facts and legal issues simply cannot be deemed to have been a **refusal or direct failure** to comply with the Court's

Order that would support a prima facie showing of contempt. After the June 29 Order, the Company never **refused** to comply with the Court's Order. Moreover, given the extraordinary nature of contempt, the mere passage of three weeks cannot be deemed or implied to have been a refusal or direct failure of compliance.

The Company also maintains that the notion of whether or not there has been a refusal or failure to comply, *in fact*, is intertwined with whether there has been a reasonable time within which to comply. The phrase "fails to comply within time specified" in Fed. R. Civ. P. 70 logically means "reasonable" time, under the circumstances, in the instance of a judgment that does not designate a certain time. *Flinn v. Rains (In re Rains)*, 338 BR 99, 102-03 (E.D. Cal. 2006). Here, there was no designated compliance date in the Court's June 29th Order, so logically the Company had a reasonable time within which to comply, under the circumstances.

Thus, the Plaintiff cannot demonstrate by clear and convincing evidence that Washington Gas refused or directly failed to comply with the June 29 Order. Because the Plaintiff has the burden of establishing a prima facie case of contempt and cannot do so, the Court should dismiss the Order to Show Cause.

      2.      *Even If The Court Determines That The Plaintiff Has Established A Prima Facie Case Of Contempt, The Order To Show Cause Should Be Dismissed*

If, notwithstanding the lack of evidence on the issue the Court nonetheless determines that the Plaintiff has established a *prima facie* case of contempt, the Order to Show Cause still warrants dismissal because the Company proceeded in good faith to consider its ability to comply with the June 29 Order, was substantially in compliance before the Implementation Plan was put into effect, and now has fully complied with the Arbitration Award.

a)      Washington Gas Seriously Questioned Its Ability To Comply With
The June 29 Order

The evidence before this Court demonstrates that the Company struggled with how to comply with the June 29 Order. Critical Company personnel expended significant time and energy reviewing the status of the operational processes to determine how and if Washington Gas could reconstruct the work performed by the Inspector classifications. (*See* Savage Supp. Affidavit & Townsend Supp. Affidavit).  In seeking a stay of this Court's Order, the Company gave warning after careful review of its current operational processes, that compliance would be difficult given the circumstances that existed, including the absorption of traditional Inspector work through technology and other collectively-bargained for legitimate means.  The Company also submitted evidence that of the 28 original Inspector classification employees, only 15 employees remained in the bargaining unit; 7 employees had been promoted to management positions and 6 had retired from the Company. (*See* Affidavit of Tracy Townsend originally filed with Washington Gas' Motion to Stay in this Court at ¶5, attached as Exhibit 3 to this Memorandum of Law ("Initial Townsend Affidavit").  Any bargaining unit employee that remained with the Company upon the elimination of the classifications had been "red-circled", that is, they retained the pay grade level they had in the eliminated classification.  (*Id.*)**.** Significantly, no one suffered a loss of seniority or benefits as a result of the elimination of the Inspector classifications.  (*Id.*)**.**  This voluntary accommodation was made by the Company even in the face of the Union's utter refusal to engage in bargaining over "the effects" of the elimination the classifications, a unilateral right the Company had.

As stated earlier, the gravamen of the Arbitrator's decision was that the traditional bargaining unit work not be transferred *to supervisory employees*. However, there are other provisions of the CBA not contemplated by the Arbitrator, that allow the Company certain

flexibility about how the work can be performed, including the ability to outsource the work, with some contingent of covered employees protected from loss of employment as a result thereof. Moreover, there is no restriction on the use of technology to absorb tasks traditionally performed by bargaining unit members.

At the time of the June 29th Order, the "traditional" work at issue was being handled, for the most part, through outsourcing, automation or other legitimate ways not prohibited by the Arbitrator's decision. These circumstances are what the Company faced as it went through its careful review of how to implement the June 29 Order. There simply was not enough "traditional" Inspector classification work for 28 employees to perform. (*See* Townsend Supp. Affidavit at ¶16; Savage Supp. Affidavit at ¶14).

Furthermore, the Arbitrator **unequivocally affirmed** the Company's unilateral right to eliminate these job classifications "in whole or in part." The Company knows that with very little "traditional union work" remaining that is performed by supervisory personnel (rather than being outsourced, absorbed through automation or otherwise not traditional Local No. 96 work), it is well within its rights under the governing CBA to eliminate or reduce the classifications again, if forced to reinstate 28 positions for which there is not sufficient work. To require as an interim the superficial reinstatement of classifications that, under the correct circumstances, the Company has a unilateral right to eliminate, would have caused more confusion and disruption in the workplace and could cost a loss of pay to employees bumped to positions with lower grades, as would be required by the CBA.

These are all of the circumstances faced by the Company as it analyzed its ability to comply with the Arbitrator's Award. Under well-established law, inability to comply with an order is a defense to a claim of civil contempt. *See WMATA v. Amalgamated Transit Union,*

*Local 689*, 531 F. 2d. 617, 621 (D.C. Cir. 1976) ("Either substantial compliance or inability to comply is as much a defense in coercive contempt proceedings arising out of a labor dispute as in any other civil contempt proceeding.") (citation omitted). In considering whether an entity is liable for contempt in the labor context, the District of Columbia Circuit Court of Appeals has indicated that it is appropriate to consider "the complexity of the outstanding order, possible ambiguities, the difficulties in arranging compliance and the extent of efforts to obey its terms." *Id*. at 622.

        b)      Prior To The Motion For An Order To Show Cause, The Company Was In Substantial Compliance With The <u>Arbitration Award</u>

As of the time of the June 29 Order, the Company already was in substantial compliance with the Arbitration Award. Again, the Award did nothing to impede the rights the Company has under the collectively bargained agreement between the Company and Local No. 96.  Thus, the Company was well within its collectively-bargained for rights to utilize contractors to perform bargaining unit work, or to implement technology that makes such work obsolete. (*See* Initial Townsend Affidavit). It was only the transfer of traditional unit work to supervisory personnel that was found by the Arbitrator to be in violation of the CBA. Moreover, because the Company voluntarily allowed employees displaced by the elimination of the Inspector classifications to retain all of their seniority, pay and other benefits, there was no back pay owed to any individual member of the Union.  (*See* Affidavit of Tracy Townsend filed in support of Motion to Stay). Indeed, upon repeated requests to the Union for any claim of back pay or other such benefits, the Union has been silent. *See supra* note 2. Finally, except for a few tasks that are "traditional" bargaining unit work, and that the Company is fully prepared to reinstate, as of June 29, Washington Gas had ceased diverting traditional bargaining unit work to supervisory personnel.

Accordingly, even at the time of the June 29 Order, the Company was in substantial compliance with the Arbitration Award.

c)    <u>Washington Gas Has Implemented The Arbitration Award</u>

As stated earlier, once the Court of Appeals denied the Company's Motion for a Stay (August 30), the Company first tried to engage the Union in further resolution talks – to no avail - and then refined an Implementation Plan. That Plan was submitted to counsel for the Union on the following Wednesday (September 6) morning, requesting approval, but noting that the Plan would be implemented at the close of the business day. (*See* Savage Supp. Affidavit at ¶16). The Union rejected the Plan and the Company commenced implementation on September 6 with letters going out on September 7 to 26 employees who were in Inspector classifications as of February 9, 2005. (one recently was terminated from employment for cause).[12]

In sum, the case law is clear. To be held in contempt a party must have knowledge of the court order, the ability to comply with that order and must have directly violated specific court order. *Joshi v. Professional Health Services* (D.D.C 1985) 606 F. Supp. 302, aff'd 260 U.S. App D.C.154, 817 F2d 877 (1987). The party seeking a finding of contempt has the burden of demonstrating, by clear and convincing evidence that the Court's order was reasonably clear and specific and the alleged contemnor failed to comply with the Court's order. *Id.* As previously noted, the judicial contempt power is a potent weapon. When it is founded upon a decree to vague to be understood, it can be a deadly one. *International Longshoremen's Association v. Philadelphia Marine Trade Association,* 389 U.S. 64 , 79 (1967).

Washington Gas submits that the Union cannot carry its burden of demonstrating by clear and convincing evidence that Washington Gas refused or failed to comply with a court Order that was reasonably clear and specific as to a date certain by when compliance was expected or

---

[12] *See also* detailed discussion of Washington Gas implementation efforts, *supra* at Section A.

otherwise within a reasonable time.  Even if the Union could establish a prima facie case for

contempt, the Company nonetheless has demonstrated its good-faith efforts at compliance by

showing, among other things:

> 1) that after June 29th, it proceeded with diligence under the circumstances to determine its options, either to comply with the Order or to pursue its legal options. However, there was a serious question about its ability to comply with the Court's Order because critical operating processes had changed;
>
> 2) that it has made good-faith efforts to engage the Union in discussions to resolve the matter;
>
> 3) that it voluntarily ensured, early on, that no employee suffered a loss of seniority, benefits or base pay as a result of the elimination of the classifications (and has yet to learn from the Union of any claim for back pay or other like, individual make-whole remedies);
>
> 4) that it had effectively ceased allowing supervisory personnel to perform "traditional" Inspector classification work (good faith or substantial compliance); and
>
> 5) that, in any event, the Company has commenced implementation of the arbitration decision at this time.

Based upon these circumstances, the Court should deny a finding of contempt and dismiss the

Order to Show Cause, with an award of costs and fees to the Company by virtue of the Union's

frivolous action in pursuing contempt proceedings, particularly in light of its refusal to engage in

serious discussions about how this matter could be resolved, as the Court so directed.

### C.    Arbitrator Retains Jurisdiction under the CBA to Determine Sufficiency of Company's Implementation Plan as the Remedy for the Arbitration Award

On September 5, 2006, the "Washington Gas Light Company Implementation Plan for

Compliance with the Award in Grievance No. 2005-10" ("Implementation Plan") was executed

by Stephen Savage and forwarded on September 6th to Teamsters Local No. 96 for consideration

and approval.  (*See* Savage Supp. Affidavit at ¶16).   The Implementation Plan, which was

crafted and implemented by the Company to fully remedy and satisfy the requirements of the

Arbitration Award issued by Arbitrator Arrigo, was **rejected without discussion** by the

Teamsters Local No. 96 and without any proposed offer of amendments to the terms of the Plan.

*See* Savage Supp. Aff"), ¶16; and *supra at note* 2).

The collective bargaining agreement ("CBA") between Washington Gas and Teamsters

Local No. 96 clearly mandates for the arbitrator to retain jurisdiction under the grievance

procedure, subject to remand, for consideration and determination of any claim or any remedy

sought by either the Company or Union not previously discussed during the grievance procedure.

The CBA in Article XVIII, Section 17(a) states in relevant part that:

> The parties shall not be precluded from raising at arbitration any claim of
> seeking any remedy not previously discussed during the grievance
> procedure. However, in such cases, the **arbitrator shall remand** the
> matter to the final step of the grievance procedure for consideration and
> determination of such claim/remedy in accordance with this Article before
> the grievance may proceed to arbitration on such claim/remedy. In such
> cases, the party raising the new claim/remedy shall pay the arbitrator's fee
> for that day and, unless the grievance is resolved on remand, the
> arbitration shall resume at a time mutually convenient to the parties but in
> no case sooner than 1 week following the remand. (emphasis added).

Arbitrator Arrigo expressly referenced the above-cited provisions of Article XVIII,

Section 17(a) in concluding that the Union's request for monetary damages be rejected and stated

that "[t]he CBA requires that in these circumstances before I decide this issue the matter should

be sent back to the parties for discussion." (*See* Arbitration Decision in the Matter of Teamsters

Local Union No. 96 and Washington Gas Light Co., Grievance No. 20-05-10 at 21, attached to

Plaintiff's Application to Confirm and Enforce Arbitration Award). In accordance with the

plain, unambiguous language of the CBA and consistent with the directive and intent of Arrigo,

the Union is required to raise at the final step of the grievance procedure any claim that the terms

of Implementation Plan do not fully satisfy and remedy the underlying grievance and Award.

The Union **has not** complied with this collectively-bargained for procedural requirement.

Since Arbitrator Arrigo retains jurisdiction under the CBA to resolve any purported claim by the Union that the terms of the Implementation Plan do not fully satisfy and remedy the Award, this Court should direct Teamsters Local No. 96 to return to the Arbitrator and not usurp his jurisdiction to resolve any disputes concerning the implementation of his Award.  The United States District Court's decision in *Case - Hoyt Corporation* supports our conclusion that this Court should recognize the jurisdiction of the Arbitrator and **not intervene** in determining the sufficiency of the Company's Implementation Plan as the remedy for the Arbitration Award. (*See* 5 F. Supp. 2d 154 attached as Exhibit 4 to this Memorandum of Law).  In directing the parties to return to the jurisdiction of the arbitrator to resolve any and all issues regarding the remedy provided by his decision, the district court concluded that "the Union's attempt to embroil this Court in the merits of the underlying dispute - albeit, under the guise of a contempt proceeding-is improper."  5 F. Supp. 2d at 156.

In light of the strong federal policy favoring resolution of labor disputes through arbitration and the clear, unambiguous language of Article XVIII, Section 17(a), any claim by the Union that the terms of the Implementation Plan do not fully remedy the Arbitration Award is properly directed to the jurisdiction of the Arbitrator and not this Court.[13]

---

[13] Significantly, Teamsters Local No. 96 has signaled their position, by the filing on September 11th of an unfair labor practice charge against the Company, that the National Labor Relations Board has pre-emptive authority and jurisdiction under Section 8(a)(1) and (5) of the Act to void the terms of the Implementation Plan (NLRB Case No. 5-CA-33230).

III.    **CONCLUSION**

Based on the foregoing, Washington Gas submits that it has implemented Arbitrator Arrigo's Award, and should not be held in contempt for failing to comply with this Court's June 29, 2006 Order.

Respectfully submitted,

Robert L. Clayton (D.C. Bar No. 961474)
Karen L. Vossler (D.C. Bar No. 476522)
Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, LLC
701 Pennsylvania Ave, N.W.
Washington, D.C. 20004
Tel: 202-434-7300
Fax: 202-434-7400

*Counsel for Appellant Washington Gas Light Company*

Date:   September 14, 2006

WDC 390656v.1